UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. LA CR 24-00091-ODW |
| | ) LA CR 24-00702-ODW |
| Plaintiff, | ) |
| | ) Los Angeles, California |
| vs. | ) |
| | ) Wednesday, January 8, 2025 |
| ALEXANDER SMIRNOV, | ) |
| | ) (10:31 a.m. to 11:28 a.m.) |
| Defendant. | ) (11:40 a.m. to 12:21 p.m.) |
| ______________________________ | ) |

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Appearances: | See next page. |
| Court Reporter: | Recorded; CourtSmart |
| Courtroom Deputy: | Sheila English |
| Transcribed by: | Jordan Keilty<br>Echo Reporting, Inc.<br>9711 Cactus Street, Suite B<br>Lakeside, California 92040<br>(858) 453-7590 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Plaintiff:

LEO J. WISE, ESQ.
DEREK E. HINES, ESQ.
United States Department of Justice
Office of Special Counsel
950 Pennsylvania Avenue, NW
Room B-200
Washington, D.C. 20530
(771) 217-6091

For the Defendant:

RICHARD A. SCHONFELD, ESQ.
DAVID Z. CHESNOFF, ESQ.
Chesnoff & Schonfeld
520 South 4th Street
Las Vegas, Nevada 89101
(702) 384-5563

MARK A. BYRNE, ESQ.
Byrne & Nixon, LLP
700 North Brand Boulevard
Suite 1180
Glendale, California 91203
(213) 620-8012

CHAD D. NARDIELLO, ESQ.
1801 Century Park East
Suite 1050
Century City, California 90067
(310) 201-0123

NASER J. KHOURY, ESQ.
Naser J. Khoury Law Offices
14427 Sylvan Street
Van Nuys, California 91401
(818) 654-0001

Los Angeles, California; Wednesday, January 8, 2025 10:31 am

--o0o--

(Call to Order)

THE CLERK: Calling item one, CR 24-91 and CR 24-702, United States of America versus Alexander Smirnov.

Counsel, may I have your appearances, please.

MR. WISE: Good morning, your Honor. Leo Wise and Derek Hines for the United States.

THE COURT: Mr. Wise.

MR. CHESNOFF: May it please the Court, your Honor, David Chesnoff, Richard Schonfeld, Naser Khoury, Chard Nardiello and Mr. Byrne are present on behalf of Mr. Smirnov.

THE COURT: All right, Gentlemen. Good morning.

ALL: Good morning, your Honor.

THE COURT: All right. We're here for the sentencing in this matter, this matter actually being -- matter of fact, these cases aren't consolidated. I -- I don't know what to call them. But, anyway, both entitled United States of America versus Alexander Smirnov, Case Number 24-CR-00091 and 2 -- 24-CR-00702.

All right. Because there have been objections to the computation of the guidelines, I think it would probably be best to start there, which isn't much of a deviation from my normal practice of simply regurgitating the guidelines

calculations, asking if anyone has any objections, and then going from there. But we do have objections, and Mr. Smirnov has objected to a couple of enhancements, one a three-level enhancement because the offense caused a substantial interference with the administrative -- administration of justice under Guideline Section 2J1.2(b)(2). There is an objection to the use of that particular provision to apply a three-level enhancement.

And a similar objection regarding specific offense characteristics, that the offense involved destruction or alteration of a substantial number of records and/or the selection of especially probative records to alter. And this is 2J1.2(b)(3). Again, this is a two-level enhancement.

I guess the one that causes me the most concern is the one dealing with the interference with the administration of justice. If I understand the objection, I think the Defense is arguing that application of this particular enhancement would constitute double counting, that we were already applying an enhancement for administration of justice and that this enhancement -- application of this enhancement would be double counting. But I don't think that there has been a prior application for interference with the administration of justice. Maybe I'm wrong.

Whichever one of you lawyers would like to address this.

MR. SCHONFELD: Thank you, your Honor.

As to that specific objection -- Richard Schonfeld for the record.

THE COURT: Um-hmm.

MR. SCHONFELD: As to that specific objection, the offense for which Mr. Smirnov pled guilty is effectively an obstruction offense, and the guidelines that apply to the offense in Count 2 in Case Number 91 are the obstruction of justice guidelines. And, therefore, we do believe it is double counting because it's already included in the instant offense. For the Court to apply this particular enhancement, there would have to be conduct separate and apart from the underlying conduct that causes the conviction, and there is no separate conduct in this case.

I would also note that the congressional hearings for which the Government seeks to apply this enhancement occurred many years after the false statement for which Mr. Smirnov pled guilty, and in order to find this enhancement, it would have to be the but for cause of the substantial expenditure of resources, and that has not been established by evidence in the record.

THE COURT: But if -- if the manufacturing of this particular tale or scenario is -- is what caused the

Government to -- to hire teams of investigators to -- to investigate some of the claims that were made, seems to me that's a but for, isn't it?

MR. SCHONFELD: Well, your Honor, from a factual standpoint, the investigation occurred and Mr. Smirnov's false statement was brought into the investigation, but it was not the but for cause of the investigation.

The Court may recall that special counsel was actually appointed in the Hunter Biden case, and the authority that they have, you know, pursued Mr. Smirnov under was a derivation of the authority granted in that case.

THE COURT: But that's -- that --

MR. SCHONFELD: So, it wasn't the cause.

THE COURT: That's separate and apart from Mr. Joseph accepting a $5 million bribe.

MR. SCHONFELD: My point, your Honor, though, is this wasn't the but for cause of the substantial government resources being expended.

THE COURT: Well, I guess reasonable minds can differ. Okay.

MR. SCHONFELD: your Honor, may I address the other enhancement? I know your Honor --

THE COURT: Yes.

MR. SCHONFELD: Okay. Your Honor, the other

enhancement under 2J1.2(b)(3) is for the alteration or destruction of essential or especially probative record. In this case, the allegation in Count 2 of the indictment is that Mr. Smirnov caused the creation of a false record as opposed to the destruction or alteration of an essential or probative record. And, therefore, that enhancement does not apply.

And there's one last note that is separate from that that I would like to address, which is the Government's pursuit of an upward departure, not variance but an upward departure under the Guidelines under USSG 3A1.2 for "exceptionally high level official victim".

THE COURT: Um-hmm.

MR. SCHONFELD: The commentary to those guidelines expressly state that this applies where the individual is the President or the Vice President.

In the indictment, the false statement that Mr. Smirnov was charged with and pled guilty to was made in June of 2020, at a time where current President Biden was not either the vice president of the United Stated. And, therefore, by definition, that upward departure does not apply.

(Pause.)

THE COURT: And if I -- if I'm hearing you correctly, are you conceding the -- the objection regarding

this conduct causing a substantial interference with the administration of justice?

MR. SCHONFELD: No, your Honor. That was the first argument that I made. We don't believe that Mr. Smirnov's conduct was the but for cause of those expenditures and it's double counting.

THE COURT: Oh, actually, I was -- I was asking whether or not Mr. Wise is basically --

MR. SCHONFELD: Oh. Sorry, your Honor.

THE COURT: -- conceding that point to you.

MR. WISE: Thank you, your Honor.

No. Your Honor is right, counsel is confusing 2J1.2, which is the obstruction of justice guideline in Chapter 2, with 3C1.1, which is an adjustment for obstruction of justice in Chapter 3. And the case law they cite shows this confusion. They cite the Hahn (phonetic) case and the Fries (phonetic) case. Those are both cases where the obstruction of justice enhancement was applied under 3C1.1.

In this case, 3C1.1 was not applied in the PSR. Within the -- within -- so, there is no double counting. And your Honor I think picked up on that right from the start, and I don't know if counsel's -- I don't know why they -- they didn't.

2J1.2 specifically has a provision for an

additional enhancement where there is substantial expenditure of government resources. Counsel chose only to address the congressional oversight piece, and they make this but for causation argument. But there's nothing in the guidelines that say that that's a requirement.

But, more importantly, they ignore -- and your Honor also pointed this out -- that the FBI and the Department of Justice expended substantial government resources investigating the Defendant's false claims on not one but two occasions. They mentioned the more recent investigation in 2023, but they ignore in 2020 that the FBI in Pittsburgh and the Department of Justice out of the U.S. Attorney's Office in the Western District of Pennsylvania investigated the Defendant's specific claims, and we submitted as Exhibit 5 to our sentencing memorandum a document that was prepared at the time by the Department of Justice, by the U.S. Attorney's Office that detailed the steps that were taken to investigate the Defendant's claims. So, there is evidence -- they make the argument there's no evidence of substantial expenditure of resources. Well, that's just not true. That document evidences substantial expenditure of resources in 2020, and then obviously again in 2023, after the 1023 became public, the FBI reexamined it, and the Defendant has admitted to that, including the interview he gave with a new team, a second team of FBI

investigators and the prosecutors at that time from the U.S. Attorney's Office in the District of Delaware that ultimately became the special counsel's office. But all of that was substantial expenditure of resources before you even get to the congressional action which, as we provide in our -- in our sentencing memo should be considered, and it was extensive. It extensively involved the Director of the FBI himself and other senior officials.

So, for all those reasons, we think that enhancement is appropriate.

As to their second argument --

THE COURT: Before you leave that, was there a separate investigation out of Wilmington that was necessitated by the investigation or having to have an investigation into some of these claims?

MR. WISE: There was. That's how -- that's how this investigation began.

THE COURT: Okay.

MR. WISE: In the summer of 2023, the U.S. Attorney's Office in Wilmington was asked to look at these allegations because they involved Hunter Biden and obviously Joseph Biden, and he was interviewed -- and -- and the process began. He was interviewed in September of 2023. By that point, the Attorney General had named the U.S. Attorney in Delaware as the special counsel, and the Office of

Special Counsel was set up.

THE COURT: Okay.

MR. WISE: But, actually, as the indictment lays out, the request came from the FBI in July of '23 to the U.S. Attorney's Office in Delaware. And, again, that was separate and part from the work that the U.S. Attorney's Office in Western Pennsylvania had done in 2020 and FBI Pittsburgh had done in 2002.

THE COURT: Okay. All right. Let's then go back to the selection of or alteration of specific records, et cetera.

MR. WISE: Sure. It would be nonsensical to say that there's an enhancement for altering a record but not for wholly creating one based on a fabricated story. That's just simply not linguistically defensible. If -- if he had altered an existing record, it would clearly -- it would clearly qualify. This is an especially probative record. It is the -- the only place these allegations are memorialized. It's not like some other CHS made these allegations and then he provided a little bit of color or context or said, Oh, you know, I traveled at that time and provided some record. This was the heart -- this document was the heart of the investigation into these claims. So, of course, it's an especially probative record, and -- and the language -- you know, the language of the guidelines is

meant to be read practically. And, so, if -- if -- I mean, creating one out of whole cloth is certainly more serious than simply altering an existing one. And, so, we think that guideline also applies.

THE COURT: All right.

MR. CHESNOFF: May I respond to that?

THE COURT: Yes.

MR. CHESNOFF: Your Honor, Mr. Wise and the special prosecutor should take that up with the Sentencing Commission. Defendants are entitled to rely on the language of both legislation statutes and the guidelines. And the guidelines do not include Mr. Wise's theory. We understand his argument, but it doesn't apply because it's not the language that a defendant would know about. And, therefore, creating an argument out of whole cloth when the actual language of the guidelines does not specify what he's arguing for is -- is a violation of due process.

THE COURT: Okay. I understand you.

The interesting thing about all of this is I don't think we're looking at a guideline sentence here. So, this -- the outcome of these two objections is going to be of no moment actually.

(Pause.)

THE COURT: Were there any other objections that -- after the submission of your memo that have dawned on

you?

MR. CHESNOFF: No, thank you, your Honor.

THE COURT: Okay.

MR. WISE: Your Honor, may --

THE COURT: Um-hmm.

MR. WISE: I have one --

THE COURT: Sure.

MR. WISE: -- after we received it. So, the -- the PSR applies the zero point offender reduction.

THE COURT: Yes.

MR. WISE: And, respectfully, we don't believe it applies in this case. This is a -- a relatively new guideline.

THE COURT: Yes.

MR. WISE: And it -- it doesn't address in the commentary or application note a situation like the one we have here were the Defendant is being sentenced on two separate cases where the only common factor is the Defendant himself.

And having cases -- the reason for the related case rules is it promotes judicial efficiency and economy to have a single judge hear the sentencing hearing because obviously it's the same facts. We have two -- you know, two pre-sentence investigations that -- that accumulate the same facts about his background and his finances and all that

stuff. So, it makes -- it makes a lot of sense to have your Honor hear both cases, but that shouldn't result in a windfall for the Defendant. And, so, if he were --

THE COURT: If it were done one at a time, several months apart, and the conviction in this case would result in an offense level of whatever --

MR. WISE: Exactly.

THE COURT: -- and criminal -- and increase his criminal history score, which it would be applied to the subsequent case.

MR. WISE: Exactly.

THE COURT: You know, this isn't the first time this has come up, and I continue to be frustrated by this. I accept your argument. I've made your argument.

At the end of the day, in a criminal case, unless I am told specifically what I need to do in these cases, the benefit of the doubt goes to -- so --

MR. WISE: Understood, your Honor.

THE COURT: That's where I end up there.

MR. WISE: Thank you.

THE COURT: And I think where we all are going to end up is -- I think there's an assumption that we're going to end up with an offense level of 21, yeah, and Criminal History Category I, and the guidelines of 37 to 46, and then we're going to go from there, unless someone suggests

something different.

MR. WISE: And this is just -- just a lack of familiarity with your Honor's practice. I know in the disclosure recommendation letter, which is ECF 34, Probation recommended the additional two level upward departure that we recommended for the exceptionally high official victim, and counsel briefly addressed that. I -- I can briefly address that.

Obviously in --

THE COURT: Wait. Wait. Wait. Wait. Let's make sure we're both on --

MR. WISE: Sure.

THE COURT: You're talking about the disclosed recommendation letter from Probation dated January 6th?

MR. WISE: Yes, your Honor. And at page seven, this is where they -- they make the point most clearly.

THE COURT: Okay.

MR. WISE: Probation writes:

"Pursuant to application note five to USSG 3A1.2" --

THE COURT: Yes.

MR. WISE: -- "if the official victim is an exceptionally high level official."

And, so, then in the middle of the paragraph:

"The undersigned agrees with this
assessment based on public official
one's status and recommends an upward
departure equivalent to two levels."

-- which would take us to a 23, which results in an advisory guideline range of 46 to 57 months, and then Probation recommends a high end sentence of 57 months.

THE COURT: Fifty-seven.

MR. WISE: Counsel briefly addressed the exceptional high level official. And, as we said in our sentencing memorandum, while the Vice President was not in office in 2020, when the Defendant repeated his lies in 2023, which is relevant conduct which he's admitted to, he was obviously at that point the President of the United States. And, so, we think the upward level departure does apply. So, that would, again, take us to a 23 with a range of 46 to 57 months.

MR. CHESNOFF: Most respectfully, your Honor --

THE COURT: Sure.

MR. CHESNOFF: -- he may have been the President, but that's not what he was charged with. He was charged with 2020, and all of Mr. Wise's --

THE COURT: Wait a minute. Charged with 2020?

MR. CHESNOFF: Count 2.

THE COURT: Yes.

MR. CHESNOFF: The comments made in 2020, not comments made in 2023.

THE COURT: Okay.

MR. CHESNOFF: So, all of the nuances that Mr. Wise raises may be things that he wants to address in the future with the Guideline Commission, but the actual wording of the guidelines and the case law makes it clear that he had to be the President at the time of the offense for which he has pled guilty, not the relevant conduct argument that Mr. Wise made. That doesn't appear in any case law. it doesn't appear in the guidelines. It's an argument by Mr. Wise which can be addressed either with Congress or the Sentencing Commission but certainly shouldn't be decided in a courtroom when someone's being sentenced, again, another due process problem, your Honor.

MR. WISE: I mean, that's clearly not the case. Relevant conduct is used to apply guidelines in sentencings all the time, and -- and to say that relevant conduct somehow doesn't apply here simply ignores all of that.

(Pause.)

THE COURT: What do you think of the relevant conduct point?

MR. CHESNOFF: That was just stated, your Honor, what do I think of it? I think that if he said something today, Mr. Wise would argue that it's relevant conduct. The

fact is that the conduct that he was convicted of, your Honor, is for statements made in 2020. And nowhere in our agreement have we agreed or stipulated that what was said in '23 was relevant conduct.

THE COURT: Some of these statements were made again. I don't know how you make a distinction. It's the same subject matter, same -- same claim.

MR. WISE: And -- and the parties agreed that both sides could argue for enhancements. We agreed on the base offense level, but counsel says we didn't stipulate to that. We don't have to stipulate that it's relevant conduct. It clearly is. And, just like they've made objections and arguments about enhancements, so can we, and we think this one clearly applies.

(Pause.)

THE COURT: Wouldn't it be faster if counsel just made his points to the Court?

MR. SCHONFELD: Your Honor, I would just like to bring up what is really an inconsistency. So, on the one hand, the Government's arguing expenditure of substantial government resources through the congressional hearings and things of that nature, which occurred before the alleged --

THE COURT: Oh, it wasn't just the hearings. It was the investigations --

MR. SCHONFELD: Right.

THE COURT: -- by the FBI.

MR. SCHONFELD: Those occurred before the second false statement or relevant conduct. The indictment itself expressly states in Count 2, which is only I believe, off the top of my head, two paragraphs, that in June of 2020, Mr. Smirnov made the false statement which created the FD 1023. That's what he's pled guilty to. But now the Government wants to expand it even further to say, Oh, well, he repeated the false statement in 2023 after all of this is already being accounted for. So, let's just hit him with another enhancement on top of that. But, if you look at what is actually expressly stated in the indictment and you look at the guidelines where it specifically says definition of high level victim or official victim is Vice President or President --

THE COURT: Right.

MR. SCHONFELD: -- at the time that the false statement for which Mr. Smirnov was indicted for and for which he pled guilty to was made, it doesn't meet the definition of high level official victim.

MR. WISE: In the plea agreement, the Defendant specifically admitted he made the false statement in 2023 as well. That's part of the factual statement. It's also in the indictment. It's also in --

THE COURT: It's in the indictment.

MR. WISE: And it's also in paragraph 27 of the PSR which they haven't objected to. So, it is -- they've admitted he made the false statement. The legal question of whether it's relevant conduct we think is -- is clear, and the President was -- Joe Biden was the President in 2023 when he repeated, as your Honor has pointed out, the false claims he had made earlier in 2020.

And the last thing counsel just said, there's no inconsistency. The reason we were interviewing him in 2023 was because substantial government resources were being expended in the second investigation of his false claims. It was right at the -- right in the middle of that.

MR. CHESNOFF: Which would not have occurred if the deal with Hunter Biden hadn't blown up.

MR. WISE: That's ridiculous. It's completely ridiculous. You know, when they lose on the facts and the law, they do the old trick of attacking the prosecutors. That's -- that's the -- the last play in the play book, and I'm not even going to dignify it by responding to it.

(Pause.)

THE COURT: Well, while I enjoy this tremendously, this two points that we're arguing over, we're talking about a difference of guidelines of 37 to 46 versus 46 to 57, and I am not contemplating a sentence anywhere near either of those ranges. So, like I say, this is an interesting point,

but it isn't going to affect the outcome here, okay. And I can say that with some confidence.

Whether I like it or not, whether I like being constrained by the parties' agreements or not, I have agreed to be constrained by the parties' agreement, and that's what I intend to do, and the resolution of this particular argument that we're having now is not going to affect that at all because you all agreed to a range, and I held my nose, and I agreed to accept that deal and apply the top end of that range.

So -- so, would anyone else like to say anything on the record before we get to providing Mr. Smirnov with an opportunity to address the Court on the issue of his sentence?

MR. CHESNOFF: Court's indulgence, please.

(Pause.)

MR. CHESNOFF: Your Honor, I just had a --

THE COURT: Yes.

MR. CHESNOFF: I was going to make some comments in mitigation, if the Court would permit me.

THE COURT: I imagine it's going to be a repetition of those, what is it, eight or so letters that I've seen.

MR. CHESNOFF: Well, I would hope not, your Honor, because --

THE COURT: What -- I'm sure it's not going to be something that --

MR. CHESNOFF: It was really mostly --

THE COURT: -- we're just --

MR. CHESNOFF: -- about the 12 years of service to the United States that Mr. Smirnov performed.

THE COURT: I wouldn't -- well, okay. You can do whatever you want.

MR. CHESNOFF: Your Honor, the Government, before we began, agreed that I could address some of the things that were covered by the protective order. So, I want to have that on the record, and I will make some comments if I may, your Honor. Thanks.

THE COURT: Sure.

MR. CHESNOFF: May it please the Court, it's difficult to argue for mitigation when you kind of have an idea of the position the Court's taken. The only thing I would ask you in listening to me, your Honor, is that you consider a sentence below the 72 months that's at the top.

THE COURT: Um-hmm.

MR. CHESNOFF: The reason we gave a range was that we had an argument in our minds for the 48 months, which is more consistent with the findings of the Probation Office in the PSR than the 72 months which the Government will ask you for.

Mr. Smirnov, born in Ukraine, grew up in Israel, served in the military. From the military, he worked for another agency within the Israeli government. He came to the United States. He was involved with someone from Health and Human Services, a special agent, in helping to uncover healthcare fraud. So, he worked as a informant on behalf of this agent and successfully. He did that out of a -- a desire to serve and also, quite candidly, because some of the people that he was providing information about had -- had wronged him.

From that point in time, your Honor, he became a CHS for the FBI. Most of my experience, your Honor, has been cross examining people who are confidential informants, but in this case I learned a lot. I learned that someone could be a confidential source that did it for the reasons that were reflected year after year after year after year by the FBI agent who was his handler, that Mr. Smirnov did it for reasons of patriotism and public service.

There are 12 years of reports from the handler who dealt with Mr. Smirnov which every year validate every level of veracity, truthfulness, hard work, and effort on behalf of -- by Mr. Smirnov on behalf of the United States Government.

Most handlers only handle a confidential human source for five years. This FBI agent, because of the

success that he had with Mr. Smirnov, kept him for 12 years. Most FBI agents who get reassigned to another office, field office, don't take their CHS with them. In this case, the FBI agent took Mr. Smirnov with him, contrary to the normal policy of the FBI.

THE COURT: And why was this?

MR. CHESNOFF: Excuse me, your Honor?

THE COURT: Why?

MR. CHESNOFF: Because of the effectiveness of Mr. Smirnov.

THE COURT: And that's what the handler said?

MR. CHESNOFF: Yes.

THE COURT: That that's why he took him along with him and that's why he --

MR. CHESNOFF: Yes.

THE COURT: -- hung onto him for --

MR. CHESNOFF: Yes.

THE COURT: -- over five years?

MR. CHESNOFF: Yes.

THE COURT: Okay.

MR. CHESNOFF: And he developed a personal relationship with him. they socialized together. He went to Mr. Smirnov's house. He met his family. He met his relatives, which is kind of peculiar and a little bit contrary to FBI policy, but because of the relationship that

the handler developed with Mr. Smirnov, that's the relationship they developed.

THE COURT: I'm beginning now to question this handler.

MR. CHESNOFF: Well, if he had testified, we probably would have been questioning him too, your Honor.

THE COURT: Okay.

MR. CHESNOFF: Most importantly, your Honor, he was involved with information for multiple field offices of the FBI throughout the United States. He was involved in at least 50 to 100 investigations. He was given permission at risk to himself to wear recording devices in order to infiltrate organized crime, money laundering organizations, major fraud organizations, and he did all of this at the direction and with the assistance of the handler who year after year wrote reports to his superiors about Mr. Smirnov and his effectiveness. And those people then would sign off on Mr. Smirnov, and then those above them would sign off on Mr. Smirnov. At no time during the 12 years, other than as a result of what occurred in this case, did anybody ever question Mr. Smirnov's honesty or veracity.

Another interesting thing, your Honor, is in the indictment it talks about Mr. Smirnov having an animus towards the President. Interestingly, in the materials that we've reviewed, we have reviewed text messages from the

handler to Mr. Smirnov, which, unlike Mr. Smirnov's about perhaps Mr. Biden, the handler would regularly ridicule President Trump. So, that's the kind of relationship they had, and that's what went on during their relationship. So, this wasn't a one way street, your Honor.

You've seen the letters. The letter from his sister is a beautiful letter. He took care of his stepson who was a -- a Marine who now works for the U.S. Government. He cared for him, as a father would, even though he was not his real father.

Your Honor also knows about the terrible eye condition that he suffers from. And I remember in the beginning the Court made the comment to me that you would not want to see him suffer. He has. They've done what they can short of surgery while in the custody of the Marshals, but the fact is he is now legally blind, and that's been defined by the doctor who's treated him for years who reviewed the records that have occurred since he's been in custody, and he's -- he's now legally blind.

What I want to tell you about that is this, your Honor. I've had a lot of clients over the years. Mr. Smirnov has never once been what I would describe as a whiner or a complainer or even get angry. He understood the circumstances he was in and ultimately made a decision to accept responsibility for the one transgression that

occurred in all these years that he was serving the country.

Normally, your Honor, when you're doing a sentencing of someone who's been in a confidential informant, the Government is asking for a departure, a 5K. This is a de facto request for a 5K from us. This is a de facto request for us to say to you, your Honor, if somebody does what he did over all this period of time, regardless of the fact that ultimately he did something that the Government finds offensive and which people find offensive in terms of President Biden, the fact is, your Honor, nothing was done about his improper statement for three years after it was allegedly made, and they all worked with him for three more years.

Now, the Government's going to say they didn't know about it. They had every opportunity to investigate him in 2020 when the statement was made. Why it wasn't done? Perhaps the handler, perhaps his supervisors didn't think it was as consequential as it ultimately became. But it's an irony, your Honor, kind of a sad irony that the whole investigation would not have occurred but for the investigation of Hunter Biden who now has been pardoned, faces no punishment, and Mr. Smirnov is the one facing a punishment even though he is a tangential part of that investigation. So, again, your Honor, we're asking you to mitigate based on the entire circumstances here, and that

will tell the American people that if your dad isn't the President, you still may get some relief in the justice system. But right now, the President's son gets away with it, and Mr. Smirnov is sitting here facing 48 to 72 months.

THE COURT: Okay. Are you saying Hunter Biden lie to the FBI regarding bribes?

MR. CHESNOFF: No. He lied to the ATF about his drug use and purchasing a weapon. So, he's a liar.

THE COURT: That's a separate deal, isn't it, besides what we're talking about, the circumstances --

MR. CHESNOFF: It is, your Honor. And I'm not saying --

THE COURT: Well, don't --

MR. CHESNOFF: -- that --

THE COURT: -- don't start conflating things, because I'm trying to follow your argument. I'm trying to follow the rationale within your argument.

MR. CHESNOFF: Okay. I'm just trying to tell you that it doesn't seem very fair to the general public that one guy gets away with it and he gets left holding the bag. That's all I'm trying to say.

THE COURT: There's something I want to say, but something tells me just leave it alone.

MR. CHESNOFF: All right.

THE COURT: Talk about disparate treatment. Okay.

MR. CHESNOFF: All right. That's fine.

THE COURT: All right.

MR. CHESNOFF: Your Honor, the guidelines are advisory, but the --

THE COURT: Yes.

MR. CHESNOFF: -- 3553 factors aren't.

THE COURT: Yes.

MR. CHESNOFF: You must consider those.

THE COURT: Yes.

MR. CHESNOFF: No prior criminal record, service to the -- the country, paid now in full the tax bill that he had as a result of the second case.

THE COURT: Okay.

MR. CHESNOFF: So, he's done things to mitigate, and he's done things to show the Court that he is accepting responsibility for his conduct.

THE COURT: You said he was in the military. What -- whose military was he in?

MR. CHESNOFF: IDF, Israeli Defense --

THE COURT: Israeli?

MR. CHESNOFF: Yes.

THE COURT: For how long was he in the IDF?

MR. CHESNOFF: Short period of time when he was recruited to do something else for the Israeli government.

THE COURT: What short period of time? What does

that mean?

MR. CHESNOFF: I don't know the exact amount, but I don't think it was more than months.

THE COURT: And then he was recruited to --

MR. CHESNOFF: Perform other --

THE COURT: -- assist Israel in another function?

MR. CHESNOFF: Right.

THE COURT: Okay.

MR. CHESNOFF: Which is secret.

THE COURT: Okay. Fine.

MR. CHESNOFF: Your Honor, he assisted 10 field offices of the FBI during those 12 years. He helped with the apprehension of institutional, international transnational money launderers. He was responsible for multiple convictions. He was involved in fighting against organized crime at the direction of his handler. All of those things are the kind of things that if we were here on a 5K, an Article III judge like yourself would say, Absolutely require me to reduce and mitigate the punishment. So --

THE COURT: You know what? But the thing is in such a case, there'd be a defense attorney like you that would be arguing against believing anything that this Defendant said because he's a -- he's an out and out career crook. And then my response is, How do you expect to ever

get embedded into some of these criminal organizations without being a crook? I can't present myself to one of these organizations and -- and claim to be -- and try to be a party to that -- their enterprise. I can't. I don't have the pedigree. So --

MR. CHESNOFF: He did it at the direction of the FBI, your Honor.

THE COURT: It doesn't matter.

MR. CHESNOFF: He didn't --

THE COURT: I -- I -- the FBI can direct me to infiltrate, I don't know, MS-13, right.

MR. CHESNOFF: He didn't.

THE COURT: I can't.

MR. CHESNOFF: But, your Honor --

THE COURT: I don't have the wherewithal.

MR. CHESNOFF: -- their responsibility was to determine whether he was breaking the law doing what he was doing for them, and at no time in the 12 years did the FBI ever determine that he did anything that was illegal.

He wasn't working off the case, your Honor. He did this voluntarily at the request of his handler and the FBI. He was a vital source of assistance to the FBI. He's multilingual. He's a very charismatic person and he was able to make connections that the FBI could not have made without him, but he wasn't doing it to work off a case. He

was doing it because he was serving the country.

THE COURT: Hmm.

MR. CHESNOFF: Well, it's the fact, your Honor.

THE COURT: Okay. All right.

MR. CHESNOFF: Okay. In any event, your Honor, I would ask you in considering his contributions and considering his lack of violent history and considering his contributions as a CHS, to mitigate the sentence and not to give him the 72 months.

THE COURT: Okay. We don't have to talk about and you don't -- you know --

MR. CHESNOFF: Okay.

THE COURT: No one has talked about it. No one's brought it up, about the falsehoods to the Court when he was initially arrested and everyone is making arguments for release on -- on bond or bail, and everyone's saying, I don't know, he's only got like $1500. So -- --

MR. CHESNOFF: Well, you need to understand the context of that, your Honor.

THE COURT: Yeah, the context was --

MR. CHESNOFF: He -- he didn't lie.

THE COURT: -- we were looking for some basis upon which to assure his appearance in court, and, you know, a pretty hefty bail might do that, might provide that incentive, and he says, "Well, I've only got" -- you know,

it was a little over a thousand dollars. And that was the representation to the Court, correct?

MR. CHESNOFF: The question was, "What do you personally have," and he represented what he personally had. he did not represent what companies had that he had a position in.

THE COURT: Okay.

MR. CHESNOFF: But that was because this was done immediately upon his arrest, and at no time did anybody ever say to him, Please describe to me what LLCs you may be a part of, and it happened at the moment.

But you got to remember this too, your Honor. He was out for two days. He didn't go anywhere. All he did was come to our office to go to work. So, the idea that somehow he was a flight risk, he disproved that. So, I understand the Court's concern, but I don't really believe he lied to the Court.

THE COURT: Okay.

MR. CHESNOFF: And, with that, I thank you.

THE COURT: Thank you, sir.

MR. CHESNOFF: When do you want Mr. Smirnov to allocute, your Honor?

THE COURT: Trust me, I'll be able to make that invitation as I do every sentencing.

MR. CHESNOFF: Okay. He asked me. That's why I

asked, your Honor.

THE COURT: Who asked who?

MR. CHESNOFF: Mr. Smirnov asked me.

THE COURT: Oh, tell him to sit tight. It's coming.

MR. WISE: So, just picking up on your Honor's -- on the last point, you know, we -- what the tax case revealed was that he was using these other accounts as his personal piggy bank. So the idea that he's asked what kind of resources do you have access to and he says a thousand dollars when he's got $6 million in these various accounts was a lie. And we've maintained that from the beginning, and it was why we, among other factors, believed he was a flight risk.

I'll briefly address some of what counsel has said, and obviously I'm not going to repeat what's in our sentencing memorandum. I don't want to waste the Court's time, but I'll -- I'll put on the record our position.

You know, the -- the question this case raises is how did the Defendant repay the United States for the generosity it showed him. And the way he repaid it was by lying to it. Now, the -- the United States welcomed the Defendant many years ago and had offered him security and prosperity and freedom, and in 2015, it bestowed on him one of the most precious gifts our government can give, and

that's citizenship. And in the case of the Defendant, the security America afforded him was real, and we know that given that the two countries in which he's lived are at ward. And the prosperity that America afforded him was also real and has -- as the Government learned, he made more than $2 million in 2020 and 2021 and 2022 alone.

Now, our country imposes very few positive obligations on its citizens. In many countries, military service is compulsory but not here. In many countries, voting is compulsory, but not here.

So, what are the obligations that are imposed on citizens? Well, jury service, the important work that goes on in these courtrooms, and really taxes. And, so, how did the Defendant meet his obligations? He didn't. And this is something that was completely absent from counsel's argument. He said one transgression, one transgression. Well, he lied and cheated on his taxes for years. He filed -- he lied about the millions of dollars he made. He filed false tax returns. He even claimed credits for poor people and people struggling to make ends meet, for instance, the Earned Income Tax Credit and Pandemic Rebate, all the while living in luxury in California and Las Vegas, driving a Bentley, spending hundreds of thousands of dollars on clothes and accessories for himself and his longtime girlfriend.

The Defendant stands before your Honor today not because of a single transgression, a single bad decision, a mistake or a momentary lapse in judgment. He's here because he engaged in multiple crimes and different crimes over a period of years, and it's those crimes that reflect his character.

And the common theme that runs through these crimes is lies. He lied on his taxes to evade his responsibility to pay his fair share, and -- and, most importantly, he lied to the FBI about the most important thing he ever told them, that the former Vice President of the United States who was then a candidate for President and the presumptive nominee of one of the two major parties had taken bribes, and he did this to influence the outcome of the presidential election of that year, as evidenced by the messages he sent to his FBI handler that are included in the indictment and in our sentencing memo. That's how he repaid the generosity of the United States, by lying to the federal -- by lying to federal law enforcement in an attempt to influence a presidential election.

And, so, counsel's main argument at the podium here and then in their sentencing memorandum for why he deserves a sentence at the low end of the range, a four-year sentence, as opposed to a sentence at the high end, the six years, which is what the Government believes is appropriate,

is to point to his work as an informant and to mischaracterize that works as service to the FBI, and they say this again -- again and again in their -- in their memorandum. In the very first sentence, the write:

"The Defendant effectively and faithfully served the FBI for over a decade."

But, of course, that's not true because in 2020, he lied to them. And, to be clear, informants don't serve the FBI. They're paid for the information they provide. Counsel said he did this voluntarily. He got $300,000 for this. And much of the information that informants provide is not useful. Some of it is, and that was certainly the case here.

In sum and substance, he had a transactional relationship with the FBI. He's not like a cooperator in a case working off time. He was paid for his time and his information.

And informants are, as your Honor pointed out, by definition, people who are involved in crime or have relationships with people who are involved in crime. They are not and this Defendant is not people of good character.

And in support of their inaccurate claim -- and this is in their -- this is in their sentencing memo -- that the Defendant effectively and faithfully served the FBI for

over a decade, they write -- and this is a quote:

"His FBI handling agent also documented Mr. Smirnov's reporting was honest and forthright."

That's on page 12 of their memorandum. But they omit -- they omit what comes next in the report that they quote, and what comes next is -- and this is -- first, this is the part they quote:

"Generally -- generally, the handling agent believes reporting to be honest and forthright. However, the handling agent notes that the Defendant has shown some reluctance to provide specifics concerning friends and family residing in Israel and Russia who are providing various -- with various subsource reporting. The Defendant also has close friends in the U.S. who are engaged in various criminal activities, has reported some of these activities, but the handling agent expressed that they may have been minimized."

So, even their central claim that he was honest and forthright is qualified. But then they double down on this, and they go on to say:

"Mr. Smirnov's reporting accuracy and honesty was never once questioned by his government handlers."

Well, that again is not true based on what I just read, but it's also not true based on the last report that they quote, the last validation report that covers him where there's various concerns expressed. In fact, the ultimate conclusion the FBI recommended, their validation unit recommended, was that the Defendant should not be continued for operations. They recommended that FBI Seattle take steps to determine whether the Defendant is involved in any criminal activity such as money laundering, bribery or impersonating an FBI agent. And if they determined that he did, the FBI should consult with the highest level of FBI's leadership. The validation unit recommended that FBI Seattle suspend operations and taskings for the Defendant until completing additional vetting measures to ascertain whether Defendant is fully under FBI Seattle's control, and all of this was before he was charged. So, it is not the case -- it is not the case that no one ever questioned him.

But the hyperbole ramps up even further, and in addressing the 3553(a) factors, they write that:

"The public (that is, the grateful United States citizens who Mr. Smirnov helped by serving as their effective

CHS) will not need to be protected."

Grateful United States citizens. You mean the people that paid their taxes when the Defendant cheated on his and the voters who would have been manipulated if the Defendant's lies had become public in 2020 or when they did become public in 2023? And while the Defendant wasn't paying his taxes, he was getting $300,000 worth of taxpayer money for the information he was providing. And, so, at the end of the day, the American public doesn't owe this man anything.

As we lay out in our memorandum, your Honor, the 3553(a) factors support a 72-month sentence.

As to the 3553(a)(1) factors, the nature and circumstances of Count 1 of the obstruction indictment, the Defendant decided in 2020 to exploit the position of trust he enjoyed with the FBI in order to provide false information about one of the candidates for President of the United States in an attempt to influence the outcome of the election. The information he provided which was memorialized in a 2020 1023 was detailed and specific and was clearly designed to deceive the FBI into pursuing a public investigation into the then candidate, and the FBI did investigate the Defendant's allegations but closed the investigation without it becoming public. And the false 2020 1023 ultimately did become public in the summer of 2023

and again threatened to influence a U.S. Presidential election when the FBI chose to reexamine it. And it's the indictment in this case that resulted from that second investigation. Thus, his false statements in 2020 which caused the creation of that document threatened the integrity of not one but two U.S. Presidential elections.

As to the nature and circumstances of the tax offenses, those are described in detail. He earned a substantial amount of money. Instead of paying taxes he owed as an American citizen, he instead filed multiple false returns over a three-year period in his name, in another person's name, and in the name of a business.

As to the history and characteristics of the Defendant, the Defendant may have provided information to the FBI that was not false in connection with other investigations, but that is not a mitigating factor. It led -- it directly contributed to the crime he committed. It led to the position of trust that he exploited in 2020. Put another way, the FBI investigated the allegations leveled by the Defendant in the 2020 1023 in 2020 and again in 2023 precisely because they trusted him, and they trusted him because some of the information the Defendant had previously provided had proven to be accurate.

Now, in various pretrial filings in this case, defense counsel has again claimed that Defendant served the

Government. And, again, he didn't. He was paid for his information, and that was the extent of his relationship.

He was a sophisticated -- he is a sophisticated individual, sophisticated enough to generate more than $2 million in income but also to know to file all of these false returns in order to cover his tracks.

And, finally, these crimes were not, again, an aberration, a single bad decision. They were -- they were carried out over -- over years.

As to the factors under 3553(a)(2), those -- that portion of the statute requires the Court to consider the need for a sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence and to protect the public. And, again, we -- we submit a sentence of 72 months is sufficient but not greater than necessary to meet those factors.

As we cite in our sentencing memorandum, tax crimes are indisputably serious. That's the Tomco case. And the guidelines themselves talk about how tax crimes such as this one with significant hidden income is more serious and should be treated as such.

As to the -- as to causing the creation of the false 2020 1023, interfering in a U.S. Presidential election by falsely accusing a candidate of one of the two major

parties of corruption is among the most serious kinds of election interference one can imagine, and the fact that the Defendant's false accusations were investigated not one but during two successive presidential elections effectively doubled the severity of his crime. In each election cycle, America's adversaries attempt and in some cases successfully spread misinformation. And sentencing the Defendant to 72 months of incarceration will deter messengers like him of such misinformation by demonstrating that if they are caught, they will be punished.

Finally, the -- the public must be protected from activities designed to distort our elections through the introduction of misinformation, a further reason for a sentence of 72 months.

With that, I'll end, your Honor, unless the Court has any questions, and thank you for your time and consideration.

THE COURT: Thank you, sir.

Does any other defense counsel wish to make any remarks?

MR. CHESNOFF: No, thank you, your Honor.

THE COURT: All right. Mr. Smirnov, by statute, you are permitted to address the Court at this time on the subject of your sentencing. Now is the time. I'll say this. It's not necessarily a part of this proceeding, but

it happens to be my practice that I cannot make a decision with respect to sentencing until I have heard from the Defendant because up until this point, I hear from everyone but the Defendant, and I know very little about the Defendant, and I don't feel comfortable imposing any kind of punitive outcome on someone that I just don't know at all.

I would like to hear from you. I would like to get to know as much about you as I possibly can. Otherwise, I'm pretty much left to dealing with you as a number. I wouldn't want that. I'm sure you don't want it. I don't want to be a party to that. So, I hope you will take advantage of this opportunity to -- to address the Court.

Now, you've heard a number of questions being raised. You can choose to address these questions or not. That's completely up to you. Okay.

MR. CHESNOFF: Your Honor, may we -- may we -- not knowing that that's how you proceed, may we have a short recess to talk to Mr. Smirnov?

THE COURT: Sure.

MR. CHESNOFF: Thank you.

THE COURT: All right. Ten minutes.

(Proceedings recessed briefly.)

THE COURT: All right. Let's go back on the record, which will reflect that all counsel and the Defendant are present.

All right. We had just reached the part where the Defendant was invited to allocute if he so desired.

MR. CHESNOFF: And, your Honor, based on your comment that you wanted to get to know him, Mr. Smirnov offered to do that in a CIPA setting so that he could really talk to you about what he's done and where he comes from, and I believe that that was relayed to you as a request, and I'm assuming -- based on what I understand, the Court did not want to do that.

THE COURT: No, I don't. We've had -- well, the Court's been exposed to confidential information. We've had our hearings, in camera hearings, including this morning, and I've taken all of these things into consideration, and I can understand why Mr. Smirnov would like to say the same thing but in his own words, make sure that his audience understands, you know, his point of view, and I think I've got a grasp of his position on this and his position as to the value of his -- his service as a confidential human source. I -- I think I've got it, and this is not my -- well, okay, maybe it's my second case involving informants and how that mechanism works and what those folks are like and what their bona fides generally are and have to be demonstrated. I think I understand. And defense counsel has done superb job of characterizing their client and their client's role, and I think I've got it. I can't imagine

that I'm going to learn anything new.

MR. CHESNOFF: He -- he just didn't want you to continue with the perception that somehow all of his involvement was because he was some kind of a crook or a criminal, and he wanted to talk to you privately with the Government present to express to you the history of his involvement with them and to explain that, despite the Government saying that 12 years of service is somehow disrespectful to the American public, he wanted to tell you the real relationship that he had with the FBI handler and how he did this out of patriotism.

THE COURT: Oh, oh. That's going to be a hard sell, okay.

MR. CHESNOFF: That's why he wanted to --

THE COURT: That's a hard sell because I -- I've never seen a case where someone working in that undercover capacity, working in the underworld goes to work every day waving the flag. Okay. What they're actually waving is a get out of jail free card or a -- some credits, hoping that a prosecutor will step in and make some recommendations with the sentencing court, but it -- it is not out of patriotism. It is not altruism. It is not charity, not by a long shot.

MR. CHESNOFF: Your Honor, he wasn't working --

THE COURT: It's about self-interest.

MR. CHESNOFF: -- off the case.

THE COURT: Pardon me?

MR. CHESNOFF: He was never working off a case.

THE COURT: I know that's what you said.

MR. CHESNOFF: Well, it's true.

THE COURT: Okay.

MR. CHESNOFF: That's a fact.

THE COURT: Okay.

MR. CHESNOFF: And, so, the Court's con --

THE COURT: I've got I believe another set of facts.

MR. CHESNOFF: Well, I understand, but they're not based in facts. They're based in a perception that you have.

THE COURT: I know.

MR. CHESNOFF: Which is an inaccurate on.

THE COURT: I know, and you would not mislead the Court. Okay.

Now, what I --

MR. CHESNOFF: No, I would not, your Honor.

THE COURT: -- need to know at this point -- what I need to know at this point is whether or not your client desires to allocute or should we just move on.

MR. CHESNOFF: He has something he'd like to read to you, your Honor.

THE COURT: Did he write it?

MR. CHESNOFF: With my assistance.

THE COURT: That's what I thought.

MR. CHESNOFF: Well, your Honor --

THE COURT: Go ahead.

MR. CHESNOFF: -- that is not uncommon for a criminal defense lawyer to assist his client in structuring what to say to an Article III judge.

THE COURT: Okay. Go ahead. It's just -- all I'm saying is it tends to be more effective when it comes from the Defendant.

MR. CHESNOFF: And that's why he wanted to talk to you privately.

THE COURT: Let's go.

THE INTERPRETER: He's not going to read anything, your Honor.

(Pause.)

THE COURT: Go ahead, sir.

MR. SCHONFELD: Your Honor, our client has changed his mind. He's going to --

THE COURT: I'm not surprised. All right. Any reason the Court cannot now proceed with the imposition of sentence?

MR. WISE: Not from the United States, your Honor, no.

MR. CHESNOFF: No, your Honor.

THE COURT: And no cause to the contrary appearing to the Court and having considered the sentencing factors enumerated at 18 U.S.C. Section 3553(a), including the advisory guidelines range which I have just changed --

(Pause.)

THE COURT: -- advisory guidelines range of 46 to 57 months based on an offense level of 23 and a Criminal History Category I, it is ordered that the Defendant shall pay to the United States a special assessment of $400, which is due immediately. Any unpaid balance shall be due during the period of imprisonment at the rate of not less than $25 per quarter and pursuant to the Bureau of Prisons Inmate Financial Responsibility program.

It is ordered that the Defendant shall pay restitution in a total amount of $675,502 pursuant to 18 U.S.C. Section 3663 in Docket Number 24-CR-00702.

The amount of restitution ordered shall be paid to the victim, Internal Revenue Service, and it shall be paid in full immediately.

Defendant shall comply with the Second Amended General Order 20-04. Pursuant to guideline Section 5E1.2(a), all fines are waived as the Court finds that the Defendant has established an inability to pay a fine.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Defendant, Alexander

Smirnov, is hereby committed on Count 2 of the indictment in Case Number 24-CR-00091 and Counts 1, 5 and 8 of the indictment in Case Number 24-CR-00702 to the custody of the Bureau of Prisons for a term of 72 months. This term consists of 72 months on each of Count 2 of indictment 91 and Counts 1, 5 and 8 of indictment 702 to be served concurrently.

The Court also recommends that the Defendant be considered for participation in the Bureau of Prisons Residential Drug Abuse Program. That's PRDAP. Upon his release from imprisonment, he shall be placed on supervised release for a term of two years. This term consists of two years on each --

MR. CHESNOFF: Excuse me, your Honor. The stipulation in the plea agreement was for one year of supervision. That was part of the Rule 11 plea.

THE COURT: Okay. And if I don't do that and I impose an additional year of supervised release, the deal's off?

MR. CHESNOFF: He would be permitted to withdraw his plea.

THE COURT: I know what he's permitted to do.

MR. CHESNOFF: Okay.

THE COURT: I'm asking you is he going to exercise that.

MR. CHESNOFF: We'd have to talk to our client because we're surprised that that's happened.

(Pause.)

MR. CHESNOFF: May we talk to our client?

THE COURT: Yeah.

(Pause to confer.)

MR. CHESNOFF: Your Honor, may the Government and I approach you at sidebar?

THE COURT: Yes.

(Sidebar discussion off the record.)

(Pause to confer.)

THE COURT: All right. Okay.

(Pause.)

THE COURT: All right. Let me pick up where I left off, and then I'm going to go back and discuss the -- the sentence. Let me -- I left off with the supervised release, and I am imposing one year of supervised release on each count. That's one year on Count 2 of indictment 91 and one year on Counts 1, 5, and 8 of indictment 702, concurrently, and the supervised release with respect to Counts 1, 5 and 8 of indictment 702 shall be served concurrently with the one year supervised release on indictment 91.

All right. Now, back to the -- to the -- the Counts -- Count 2 of indictment 91, the sentence on Count 2

is 72 months.

With respect to indictment 702, Count 1 of that indictment is a sentence of 60 months. Count 5 of indictment 702 is also a term of imprisonment of 60 months, concurrently with the term of 60 months on Count 1. Count 8 on indictment 702 is 12 months, and that will be consecutive to the terms imposed on Counts 1 and 5 of indictment 702. And the terms imposed on indictment 702 are to run concurrently with the terms of imprisonment imposed in 91.

In the final analysis, the total term of imprisonment on both indictments, all four counts, is 72 months.

Now, with respect to supervised release and the various conditions of supervised release, Defendant shall comply with the rules and regulations of the United States Probation and Pretrial Services Office and Second Amended General Order 20-04, including the condition of probation and supervised release as set forth in Section 3 of that general order.

Two, Defendant shall refrain from any unlawful use of a controlled substance. Defendant shall submit to one drug test within 15 days of release from custody and at least two periodic drug tests thereafter, not to exceed a test per month as directed by the Probation Officer.

Three, Defendant shall participate in an

outpatient substance abuse treatment and counseling program that includes urinalysis, breath or sweat patch testing as directed by the Probation Officer.

Defendant shall abstain from using alcohol and using illicit drugs and from abusing prescription medications during the period of supervision.

Four, as directed by the Probation Officer, Defendant shall pay all or part of the cost of the court-ordered treatment to the aftercare contractors during the period of community supervision. Defendant shall provide payment and proof of payment as directed by the Probation Officer.

Five, during the period of community supervision, Defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment.

Six, Defendant shall cooperate in the collection of a DNA sample from himself.

Seven, Defendant shall apply all moneys received from income tax refunds, lottery winnings, inheritance, judgments and any other expected or unexpected financial gains to the court-ordered financial obligations.

Eight, Defendant shall truthfully and timely file and pay taxes owed for the years of conviction and shall truthfully and timely file and pay taxes during the period

of community supervision.

Further, Defendant shall show proof to the Probation Officer of compliance with this order.

Nine, Defendant shall not be self-employed nor be employed in a position that does not provide regular pay stubs with the appropriate deductions for taxes unless approved by the Probation Officer.

Ten, Defendant shall comply with the Internal Revenue Service's reporting requirements as they pertain to virtual currencies and shall provide proof of having done so to the Probation Officer.

Eleven, as directed by the Probation Officer, Defendant shall provide to the Probation Officer, one, a signed release authorizing credit report inquiries, two, Federal and State Income Tax Returns and a signed release authorizing their disclosure, and, three, an accurate financial statement with supporting documentation as to all assets, income, expenses and liabilities of the Defendant.

Twelve, Defendant shall submit his person, property, house, residence, vehicle, papers, computers, cell phones, other electronic communications or data storage devices or media, email accounts, social media accounts, Cloud storage accounts or other areas under Defendant's control to a search conducted by a United States Probation Officer or a law enforcement officer. Failure to submit to

a search may be grounds for revocation. Defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that Defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

The Court authorizes the Probation and Pretrial Services Office to disclose the Presentence Report to the substance abuse treatment provider in order to facilitate Defendant's treatment for narcotic addition or drug dependency. Further redisclosure of the Presentence Report by the treatment provider is prohibited without the consent of this Court.

Now, pursuant to 18 U.S.C. Section 3553(a), the Court is obligated to impose a sentence that is sufficient but not greater than necessary to comply with the purposes of 3553(a)(2). The Court in determining the particular sentence to be imposed has considered the nature and circumstances of the offense and the history and characteristics of the Defendant. The Court has recognized the need for the sentence imposed to reflect the seriousness of the offense, that it should promote respect for the law and provide just punishment for the offense. It should afford adequate deterrence to future criminal conduct and

protect the public from further crimes of the Defendant and provide the Defendant with needed correctional treatment in the most effective manner.

The Court has considered the various kinds of sentences available and the guideline sentencing range. The Court also has recognized the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the Court also recognizes the need to provide restitution to the victims of the offense.

Before the Court is Alexander Smirnov, a 44-year-old Defendant who pleaded guilty to two separate dockets. In one docket he pleaded guilty to one count charging falsification of records in a federal investigation -- and that's Docket 91 -- while in the other docket, he pleaded guilty to three counts charging tax evasion. That's Docket 702.

Regarding the falsification of records charge, Mr. Smirnov was a confidential human source with the Federal Bureau of Investigation where he provided information to the FBI and was admonished about being truthful on many occasions. However, Smirnov provided false statements regarding Public Official 1 in 2020 who was the former Vice President of the United States and a candidate for President of the United States, now the current President of the

United States.

These statements were memorialized by the FBI and were fabrications. When interviewed by the FBI, Smirnov repeated some of the false claims and promoted a new falsehood about the son of Public Official 1. According to information provided by the Government, the FBI and the United States Department of Justice assigned investigators to assess the truth of the allegations made by Smirnov and included a congressional oversight process.

Also in 2020, Smirnov sent his handler a series of messages that expressed bias against Public Official 1. These messages were sent electronically via messaging platforms or applications.

Regarding the tax evasion charges from 2020 to 2022, Smirnov received income from multiple sources that he used to pay for personal expenses related to himself and his domestic partner. He concealed these earnings by filing false tax forms for himself and his domestic partner as well as the business Goldman Investment Group. According to the Government, Smirnov owes the Internal Revenue Service a total outstanding tax of $675,502, which is broken down as follows for the following tax years:

$458,744 for the year 2020, $145,171 for the tax year 2021, and $71,587 for the tax year 2022.

Aside from the instant dockets, Smirnov has no

prior convictions. He was assessed with zero criminal history points and placed into Criminal History Category I. Under the current Sentencing Guidelines Manual, Smirnov appears to be eligible for the zero point offender reduction.

The advisory guidelines have accounted for the facts of the case, including the counts of conviction, the substantial interference with the administration of justice, the especially probative document involved, the victim being a former government officer at the time of the offense, the abuse of a position of trust, the amount of tax lost, the sophisticated means used for the tax evasion, the multiple count adjustment, Smirnov's acceptance of responsibility and the zero point offender reduction.

By pleading guilty, Smirnov has accepted responsibility. By participating in an interview, Smirnov has complied with the Probation Officer.

He was raised by his mother and stepfather. He was raised by them in the Soviet Union until he was 11 years old when he moved to Israel. Smirnov's basic necessities were met as a child. He suffered from no financial hardships. He was close to his family and spent time with his family by traveling and going to the movies.

He notes having a normal upbringing. He maintains relationships with his mother, stepfather, and sister who

are supportive of him. Smirnov maintains a minimal contact with his father and has contact with him only once yearly.

Regarding his physical health, Smirnov reports that he has glaucoma in both of his eyes and has had many surgeries that he cannot recall the number of. He currently legally -- he is currently legally blind in both eyes. Smirnov reports that he has to take medications and several eye drops to prevent further deterioration of his eyesight.

Smirnov further reports that he has had tetanus in his heart for the past few weeks while he has been in custody and was transported to a hospital. He has been referred to a cardiologist which is currently pending.

Regarding his mental health, Smirnov reports that he has no history of mental or emotional health problems and no history of treatment for such problems. He also reports the he has no gambling problems.

Regarding his substance abuse, he reports that he has used alcohol, marijuana, opiates and cocaine during his lifetime. His preferred substances are marijuana and cocaine. He indicates that both of these substances have caused him the most problems.

Smirnov was not under the influence of illicit substances or alcohol during the offense, and these substances did not contribute to the commission of the offense. Smirnov has no history of substance abuse

treatment but is interested in receiving it.

Regarding his education, Smirnov reports that he received his high school diploma in Israel. He also reports that he served in the Israeli Defense Force or IDF in June of 1998 for four days but was recruited into other government service for four years. He declined to discuss further details regarding this service due to confidentiality issues.

Smirnov reports that his usual occupation is as a confidential human source or CHS for the FBI. Smirnov also reports owning and having employment history related to two companies, Avalon Group, Inc., a cryptocurrency company, and Goldman, an investment company. In the future, Smirnov desires to attend college and obtain a degree in history.

(Pause.)

THE COURT: All right, sir, you have the right to appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there was some other fundamental defect in the proceedings that was not waived.

MR. CHESNOFF: Excuse me -- excuse me, your Honor. Before you get to that, you -- would you please state on the record that he gets credit for time served on both cases from February 14th, 2024 as was agreed in the agreement and as permitted so that --

THE COURT: Let's save your -- no. This will be determined by the Bureau of Prisons. I do not get involved in that. Okay.

MR. CHESNOFF: But it's -- it's part of the --

THE COURT: I don't care about what kind of an understanding you have with these gentlemen sitting over here.

MR. CHESNOFF: You accept --

THE COURT: Calculation or computation of credits is up to the Bureau of Prisons.

MR. CHESNOFF: Your Honor, you --

THE COURT: I'm not getting involved in that.

MR. CHESNOFF: Your Honor, you accepted the conditional plea, and that's part of the conditional plea.

THE COURT: I'm not saying I reject the plea. I'm saying I'm not getting involved in the computation of his credits.

MR. CHESNOFF: I'm not asking you to compute it. I'm asking you to state for the record, most respectfully, your Honor, that he gets concurrent time on both cases beginning on February 14th, 2024 as that is part of the binding plea agreement that the Court accepted.

THE COURT: Is it necessary for me to repeat myself?

MR. CHESNOFF: No, your Honor, but --

THE COURT: Good. Let's move on.

MR. CHESNOFF: I would like to make a record then so that if I have to get a transcript to provide to --

THE COURT: Go ahead. Make -- make your record so I can conclude the --

MR. CHESNOFF: The plea -- the plea agreement requires the Court to order that. That's my record.

THE COURT: You also have the right to appeal your sentence under some circumstances, particularly if you believe your sentence is contrary to the law. However, a defendant may waive those rights as part of a plea agreement, and you've entered into a plea agreement that waives some or all of your right to appeal the sentence itself. Such waivers are generally enforceable.

If you believe your waiver is unenforceable, you may present that theory to the Court of Appeals. With few exceptions, a notice of appeal must be filed within 14 days of judgment being entered.

Do you understand that, sir?

THE DEFENDANT: Yes, your Honor.

THE COURT: If you are unable to afford a transcript of the record in this case, one will be provided at Government expense. If you are unable to pay the cost of an appeal or the filing fee, you may apply within 14 days for a waiver. If you do not have counsel to act on your

behalf and if you request it, the clerk of the court will prepare and file a notice of appeal on your behalf. But, again, you must make the request within 14 days.

The notice of appeal must designate the judgment or order appealed from and the fact that you are appealing to the Court of Appeals. It should also designate the portion of the proceedings not already on file that you deem necessary for the reporter to include.

Also in its consideration, the Court has evaluated the sentencing guidelines as required by 18 U.S.C. Section 3553(a)(4) and finds the calculations of suggested sentence therein for this Defendant under the present circumstances to be reasonable. The Court, therefore, sentences the Defendant as previously stated, which is in accordance with the binding plea agreement entered into by the parties under Federal Rules of Criminal Procedure 11(c)(1)(C).

Per request of the Defendant, the Court will also make the recommendation to the Bureau of Prisons that he be assigned to or at least evaluated for inclusion in the Bureau of Prisons Residential Drug Abuse Program.

MR. CHESNOFF: Also --

THE COURT: Is there anything else? Was there anything else?

MR. CHESNOFF: Yeah, Terminal Island, your Honor.

THE COURT: Yes, Terminal Island, right. Anything

else?

MR. CHESNOFF: Will you -- you'll recommend that the Bureau of Prison place him at Terminal Island?

THE COURT: Yes.

MR. CHESNOFF: Okay.

MR. SCHONFELD: Your Honor, the Government needs to move to dismiss the remaining counts.

MR. WISE: Yes, your Honor. We were just getting prepared to do that.

THE COURT: I know.

MR. WISE: The United States moves to dismiss Count 1 in indictment 91 and Counts 2 through 4, 6 and 7 and 9 and 10 in indictment 702.

THE COURT: All right. Count 1 of indictment 91 is dismissed in the interest of justice, and Counts 2, 3, 4, 6, 7, 9 and 10 of 702 are also dismissed on motion of the Government in the interest of justice.

All right. Anything else we need to deal with?

MR. CHESNOFF: Court's indulgence.

MR. WISE: Not from the United States, your Honor.

(Pause.)

THE COURT: Whatever it is you guys are talking about, does that involve the U.S. Marshals?

MR. CHESNOFF: Yes.

MR. SCHONFELD: yes.

(Pause for counsel to confer.)

UNIDENTIFIED SPEAKER: Your Honor, can we have a sidebar?

THE COURT: We're done. Sidebar for what?

MR. CHESNOFF: We'll explain it with the Court's permission.

(Sidebar discussion off the record.)

THE COURT: All right. Back on the record.

MR. CHESNOFF: Thanks, your Honor. Your Honor, on behalf of Mr. Smirnov and in pursuit of my responsibilities to render effective assistance of counsel under the Sixth Amendment, I would ask the Court to state on the record that which is stated in the binding plea agreement which the Court accepted, that the parties agree that the Defendant is entitled to credit in both Criminal Number 24-91 and 24-702 for the period of his pretrial detention since the day of his arrest and that credits that the Bureau of Prisons may allow under 18 U.S.C. 3585(b) may be credited against the stipulated sentence including credit under Sentencing Guideline Section 5G1.3.

I would at least ask the Court to affirm that.

THE COURT: I think the -- the agreement speaks for itself. I am not going to calculate anything, and I'm not going to certify that he has been in custody for any particular period of time beginning on any particular date.

Now, that's the last time I'm going to --

MR. CHESNOFF: Will --

THE COURT: -- discuss that.

MR. CHESNOFF: Will you at least say, your Honor, that he's entitled to credit on both cases?

THE COURT: He is entitled to credits as earned.

MR. CHESNOFF: On both --

THE COURT: As determined by the Bureau of Prisons.

MR. CHESNOFF: On both cases since the day he was arrested.

THE COURT: On any case.

MR. CHESNOFF: All right. Thank you, your Honor.

(Proceedings concluded.)

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Jordan Keilty
Transcriber

1/09/2025
Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.