UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. ALEXANDER SMIRNOV, Defendant. | Case No. LA CR 24-00091-ODW<br>LA CR 24-00702-ODW<br>Los Angeles, California<br>Monday, April 28, 2025<br>(1:37 p.m. to 2:19 p.m.) |

TRANSCRIPT OF BAIL HEARING
BEFORE THE HONORABLE OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Appearances: | See next page. |
| Court Reporter: | Recorded; CourtSmart |
| Courtroom Deputy: | Sheila English |
| Transcribed by: | Jordan Keilty<br>Echo Reporting, Inc.<br>9711 Cactus Street, Suite B<br>Lakeside, California 92040<br>(858) 453-7590 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | ROBERT KEENAN, ESQ.<br>United States Department of Justice<br>United States Attorney's Office<br>4121 West 4th Street<br>Suite 8000<br>Santa Ana, California 92701<br>(714) 338-3597 |
| For the Defendant: | RICHARD A. SCHONFELD, ESQ.<br>DAVID Z. CHESNOFF, ESQ.<br>Chesnoff & Schonfeld<br>520 South 4th Street<br>Las Vegas, Nevada 89101<br>(702) 384-5563 |
| | CHAD D. NARDIELLO, ESQ.<br>1801 Century Park East<br>Suite 1050<br>Century City, California 90067<br>(310) 201-0123 |
| | NASER J. KHOURY, ESQ.<br>Naser J. Khoury Law Offices<br>14427 Sylvan Street<br>Van Nuys, California 91401<br>(818) 654-0001 |

Los Angeles, California; Monday, April 28, 2025 1:37 p.m.

--o0o--

(Call to Order)

THE CLERK: Calling Item 4, CR 24-91 and CR 24-702, United States of America versus Alexander Smirnov.

Counsel, may I have your appearances, please, beginning with the Plaintiff.

MR. KEENAN: Your Honor, good morning -- or good afternoon, excuse me. It's been a long day. Good afternoon. Rob Keenan for the United States.

THE COURT: Good afternoon, sir.

MR. SCHONFELD: Good afternoon, your Honor. Richard Schonfeld appearing on behalf of Alexander Smirnov.

MR. CHESNOFF: May it please the Court, your Honor, David Chesnoff on behalf of Mr. Smirnov.

THE COURT: Sir.

MR. KHOURY: Good afternoon, your Honor. Naser Khoury, K-H-O-U-R-Y, on behalf of Mr. Smirnov.

MR. NARDIELLO: Good afternoon, your Honor. Chad Nardiello on behalf of Defendant, Alexander Smirnov.

THE COURT: (Inaudible.) All right. Have a seat, Gentlemen.

THE CLERK: Your mic.

THE COURT: Oh, sorry. I've had so much paper coming on this little thing I've almost forgotten why we're

doing all this.

Where are we now?

MR. CHESNOFF: May I, your Honor?

THE COURT: Where are we -- yes.

MR. CHESNOFF: Thank you. Your Honor, the parties entered a joint agreement asking the Court to set bail pending appeal. It's an agreement between the Government and Mr. Smirnov. Pretrial Services has recommended that the Court follow that, which is consistent with prior Pretrial recommendations. We would most respectfully tell the Court that the standard for such a bail is the substantial likelihood of success on appeal. We have appealed to the Ninth Circuit.

THE COURT: Um-hmm.

MR. CHESNOFF: The Government agrees that there is a likelihood of success on appeal.

THE COURT: You're going to have to explain that one to me.

MR. CHESNOFF: They --

THE COURT: What is it that you're appealing that you think that there's going to be a substantial chance of success?

MR. CHESNOFF: We had a Rule 11 plea, your Honor.

THE COURT: Yes.

MR. CHESNOFF: And --

THE COURT: And you've got what you asked for.

MR. CHESNOFF: Not -- most respectfully, your Honor, we insisted at the conclusion of the sentencing that the Court agree that he get the credit for time served from both cases from the beginning of his arrest. The Court, again, your Honor, with due respect, repeatedly refused to put that on the record. And, as a result, he did not get the benefit of his contract and --

THE COURT: He got the benefit. He -- the deal was he was going to be sentenced somewhere between 48 and 72 months.

MR. CHESNOFF: There were other conditions as well, your Honor, which included --

THE COURT: They don't apply to me.

MR. CHESNOFF: Well, it did, your Honor, most respectfully. But that's for the --

THE COURT: Well, number one --

MR. CHESNOFF: That's for the Ninth Circuit to decide at this point, your Honor, but --

THE COURT: You realize I'm not a party to a plea agreement? I -- I can agree to -- to accept it or reject it, but I'm not a party. I don't have any other duties --

MR. CHESNOFF: Right.

THE COURT: -- other than to carry out the sentence.

MR. CHESNOFF: And you accepted it. But you refused to say on the record all the terms of the agreement. So, now the Ninth Circuit will decide whether or not that was appropriate. But in consultation with the --

THE COURT: And what will that do?

MR. CHESNOFF: That will lead to him being able to withdraw his plea, your Honor.

THE COURT: That's what this is all about?

MR. CHESNOFF: Well, yeah. What it's really all about, your Honor, is protecting his rights and making sure that everything that he bargained for occurs and making sure that he's entitled to all the rights that someone in a Federal Court in the United States is entitled to, and the Government agrees with us, your Honor.

THE COURT: I want to ask which government, but I'm not. I don't care.

MR. CHESNOFF: Well, it's the present Justice Department.

THE COURT: Yeah.

MR. CHESNOFF: Different from the fellows that were here before.

THE COURT: Okay. That -- that's fine. It doesn't matter to me. I'm not a party to this agreement.

MR. CHESNOFF: But you accepted it, most respectfully, your Honor.

THE COURT: I did. And I agreed to sentence him accordingly, and I did. And I'll say it again. It is not within my purview or responsibility probably or authority to do the computations for time credits. That's the Bureau of Prisons.

MR. CHESNOFF: All right. Mr. Schon -- if --

THE COURT: Sure.

MR. CHESNOFF: -- the Court's indulgence?

THE COURT: Sure. Absolutely, yes.

MR. SCHONFELD: Your Honor, paragraph 19 of the plea agreement expressly provided that one of the conditional aspects of the plea agreement was that the Court would order that he receive credit from the date of his initial arrest, and the Court refused to grant that request, and that wasn't --

THE COURT: No, I don't -- I don't do that.

MR. SCHONFELD: But, your Honor, that's the point. If -- if the Court was not going to do that, the Court can't choose to piecemeal accept the conditional components of the plea agreement. Under the Ninth Circuit case law, the Court can either accept all aspects of the conditional plea or reject the conditional plea. In this instance, the Court accepted some components of the conditional plea and then refused to order the one component that's on appeal, which was conditional, and that is that the Court order that he

receive credit towards both cases from the date of his arrest.

As a result of that, paragraph two of the plea agreement expressly provides that the provisions of the plea agreement are void and a nullity, and, therefore, he's permitted to withdraw his plea. So, there is a high likelihood of success on appeal because the court accepted some components of paragraph 19 of the conditional plea but rejected one component, and the case law says that a plea agreement is contractual and, therefore, he would be permitted to withdraw his plea.

THE COURT: I have a feeling that one of the prongs that are necessary for his release pending appeal is that there be a high chance of success on appeal, and I doubt that's going to happen.

I'm looking at United States v. Jay, a memoranda decision filed February 20th of this year:

" Mr. Jay contends that the District Court erred by failing to award him credit under 18 U.S.C. Section 3585(b) for time served on a related incarceration at the Fort Hall Tribal Justice Center. This claim fails because Section 3585(b) does not authorize a District Court to compute

the credit at sentencing," citing United States v. Williams, yada, yada, yada.

"Rather, the Bureau of Prisons makes that determination after the sentence is imposed."

Now, you all do what you will. I stand by my original decision. I am not computing time served. Okay. Now --

MR. CHESNOFF: Your Honor, assuming --

THE COURT: Yes?

MR. CHESNOFF: -- that the authority is as you stated, then Mr. Smirnov did not get what he bargained for because the Government agreed that he would get it, and he didn't get it, and it may be for the reasons you're stating, but the fact is you did not order it. You made your decision, but he didn't get the benefit of his bargain.

And I just want to say one more thing in that regard, your Honor. The Government is agreeing in the Ninth Circuit to tell the Ninth Circuit that they agree with us. So, I know that the Court said you find it unlikely that they're going to do it, but the Government agrees with us, and they're going to tell the Ninth Circuit that they agree with us.

THE COURT: And you want me to do something about that today?

MR. CHESNOFF: No.

THE COURT: Okay.

MR. CHESNOFF: I want you to --

THE COURT: What -- what do we have remaining to do today?

MR. CHESNOFF: I just want -- all I want is bail pending appeal, your Honor.

THE COURT: No.

MR. CHESNOFF: And may I make a further record then?

THE COURT: Sure.

MR. CHESNOFF: Thank you.

Number one, your Honor, we think we've established that there's a high likelihood of success on appeal. We understand the Court's position.

THE COURT: The court disagrees.

MR. CHESNOFF: Okay. Your Honor, the Government, Pretrial, and us have submitted to you that he is not a danger to the community --

THE COURT: No.

MR. CHESNOFF: -- nor that --

THE COURT: I don't believe he is.

MR. CHESNOFF: Okay -- nor that he's a flight risk, your Honor.

THE COURT: I'm not convinced on that one.

MR. CHESNOFF: Well, may I help you?

THE COURT: Sure.

MR. CHESNOFF: Okay. Originally, this Court was concerned about money that was allegedly unaccounted for, alleged --

THE COURT: How much?

MR. CHESNOFF: A million dollars, okay. That was what --

THE COURT: That was overlooked?

MR. CHESNOFF: No. This is what happened, your Honor. He was arrested. He was given a pretrial interview. he had no one there with him. They asked him, "What money do you have that's yours?" He told them the truth. He didn't know that he was supposed to talk about hips significant other's account, which was her own account. She had her own money from prior relation -- from a prior relationship. And, so, he did not deliberately mislead you, your Honor.

I'm telling you now, your Honor, you were told that he misled you by people who told you that I believe during the initial ex parte communication that they had with the Court, before the Court issued the arrest warrant and had him arrested in our office.

So, the fact is he didn't mislead anybody, your Honor. And then the proof is in the pudding, your Honor.

He got -- did a Pre-Sentence Report. During the Pre-Sentence Report, the Probation Office did a thorough analysis of his -- his finances. At no time do they indicate anywhere in that report, which the Government signed off on, that he hid money, that he had hidden money, that he did anything to suggest that he had hidden money. And then your Honor will remember that just before the sentence -- the -- the sentencing or the entry of the plea, he actually paid almost $700,000 to the Government, close to the million dollar figure that this Court is concerned with. So, he gave the Government $671,000.

So, the idea, your Honor, that somehow he has hidden assets, that's been gone over by Probation for the Pre-Sentence Report. Pretrial has analyzed it. The Government that is agreeing with us that he should get bail pending appeal agrees that he is not a flight risk because of hidden money.

And there's something else, your Honor, I know you will feel this impactful. At no time were any bank accounts of his seized, any records of his seized. The IRS did a thorough investigation of his finances in reaching the conclusion as to what amount of money he owed. If he had hidden money, your Honor, they would have ferreted it out. There was never a forfeiture action taken against him. So, the fact remains, your Honor, based on an initial

conversation from the Government which they never proved by any kind of real evidence that he had hidden money, the Court -- and I understand it, your Honor. They're telling you that. But it's just not a fact, and I know you well enough by now, your Honor, to know that if something isn't true, you're not going to rely on it. And, so, I'm asking you to understand he has nothing hidden.

The most important reason to get him out now, your Honor, he still hasn't had that eye surgery. And I recall standing at sidebar with Mr. Schonfeld where you told me that you'd never let him go blind. Well, unfortunately, your Honor, since his arrest and without the surgery, he has gone legally blind. That's been documented by the doctors that saw him since he's been in and by Doctor Tanaka, world renowned surgeon who reviewed all of his medical records since he's in. He now needs surgery. We hope -- were hoping to get it done a week ago. The surgery can help restore what -- the damage that's been done.

But to suggest, your Honor, that he's not going to go to Vegas and live in his -- he has a residence. He's been on the west coast for 20 years, your Honor. He has no prior criminal record whatsoever, and he worked for the Government for 12 years, your Honor, providing them with valuable information that led to multiple prosecutions, and the Court is also aware that other agencies were involved,

that he helped.

This isn't a fellow who did this to work off a case, your Honor. This isn't a fellow who is a criminal. This is a person who made a conscious decision to act patriotically and assist the United States Government. And the agent who handled him and the FBI wrote -- you've seen them -- nothing but superlative reports about him, nothing but the highest praise for him when he was working with them, and only -- only after years did the special prosecutor step in and make the allegations that the special prosecutor made.

And the Court should know at one point in time the Government had closed the investigation. So, I'm asking you, your Honor. I know -- I know you came in here thinking that you shouldn't do this, but I'm telling you, your Honor, it's in the interest of justice that this happen now. Let him get bail. Let him go and get his surgery. Let us see what happens with the appeal. And then, your Honor, we'll all deal with -- with the results.

But to keep him continually locked up when there are so many good reasons to let him out, no criminal history. You'll recall his stepson who he raised is -- not only works for the Government, he's a former Marine. He's attested to him. He wrote to you in the beginning of the case, your Honor.

I'm not going to say a lot more, your Honor. But I am telling you this is a situation and a circumstance where Pretrial, the Government, and the Defendant are all asking you most respectfully, your Honor, to let him out on bail pending appeal. Thank you.

THE COURT: Does -- does the Government have comments?

MR. KEENAN: Yes, your Honor. And I actually wanted to talk about this Government. One of the great things -- I've been in the U.S. Attorneys Office for 24 years, and one of the great things about it is that, regardless of what administration happens to be in control in D.C., the rules are still applied. It's important that they be applied, and over the years, that's what I've observed, that they've been applied consistently and equally and fairly, but also with some recognition that sometimes cases deserve a second look. There's a great -- great book by Dennis Prager called Think a Second Time, and there's -- the substance of the book is reflected in that title. There -- there's no harm in looking at something anew and making sure we got it right.

And on that subject, getting back to one government nationwide, whether -- regardless of what the administration is and what party's in control to not -- to put a blunt point on it --

THE COURT: Um-hmm.

MR. KEENAN: I don't recall what time last year it was, I think middle of last year, the former U.S. Attorney under the old administration, under President Biden and Merrick Garland, Martin Estrada, down that decision chain or chain of authority -- the former U.S. Attorney created an office -- I think it's staffed by one or two people, and I think it's still reflected on our website. I haven't seen it recently, so I can't swear to it today, but I believe the office and unit -- or if you -- probably a unit is a better term. It's a post-conviction review process, and it wasn't established by the new government or a new government or a new administration. It was the old one, and we're doing the same thing that Martin Estrada thought was fair and just, same thing, no difference.

Now, to be fair, Martin Estrada and the government that existed prior to January 20 wasn't the one that prosecuted this case. As you know, it was -- that responsibility was given to the Special Counsel's Office, one of two Special Counsel Offices.

So, it's one government trying to do the right thing. That's what we're attempting to do. Without any promises or guarantees, to my knowledge about what the end result will be, it's my understanding that the review process is not complete. Decisions might be made in the

future, potential things. I understand what the Defendant and his counsel hope for, but to my knowledge, there's been no promises or guarantees about a final decision.

I -- I, frankly, think the recent filing -- the stipulation also filed I think last week about amending the protective order would be a good indicator of that. That was a -- a protective order that would allow defense counsel to share certain sensitive, confidential documents to persons outside the prosecution team.

THE COURT: Um-hmm.

MR. KEENAN: And the Court signed that, and I want to thank you for that, along with defense counsel. We appreciate the Court's approval of that stipulation.

But that -- that's an indication that the process is still underway and that whatever hoped for decisions there might be, it will be the process -- the end result will be the result of a -- a deliberative process and full review, sort of de novo review of what happened in connection with this case.

THE COURT: I -- I --

MR. KEENAN: Now, so -- I'm sorry.

THE COURT: Let -- I want to interrupt you now because -- since you're getting into this particular issue --

MR. KEENAN: Yes.

THE COURT: -- it was like passing reference was made to the fact that the Government was reviewing its earlier decisions, earlier prosecution decisions. And I'm wondering what the hell does this mean. Seriously? At this stage, the Government is -- is taking a look at this case anew? Is that --

MR. KEENAN: Correct.

THE COURT: Am I reading that correctly?

MR. KEENAN: Yes, your Honor. And that's why I started with that unit Martin Estrada --

THE COURT: Okay.

MR. KEENAN: -- created.

THE COURT: Right. Right.

MR. KEENAN: I want to make clear there's nothing new under the sun with the U.S. Government. We're -- we're applying the same rules that, to my knowledge, as a 24-year veteran of the Department of Justice, have been applied at all times, and that is that we want to make sure we get the result right and that it's -- the end result is fair and just. And there is no unwarranted disparity in the way cases are treated. And that's what we're trying to do, same thing as with Martin Estrada's administration of the U.S. Attorneys Office.

Okay. So, let's get to the -- if I might, to -- with that important context because I think it really is

important to stress. The issue about the -- the Defendants -- or Defendant intends to or I think it now has presented. I think the opening brief was filed on Friday I just learned -- relating to the -- the -- the crediting of time served.

I think that the -- the point I want to make -- and we've had no time to prepare an answering brief, and I probably won't be involved in doing that because I'm going to be heading out of town for a detail, but the -- the -- my observation in looking at the plea agreement and the stipulation and a draft of the opening brief that the Defendant's counsel were kind enough to provide is that this -- this language that's the subject of dispute on appeal, that is the basis of their claim of error, is unusual. It's not what we typically include in any of our plea agreements.

I see that as a general rule, they -- the Special Counsel's Office appears to have asked someone in our office to give us a -- give them a sample form agreement, but this language is unique. It appears to be the basis of hard-fought negotiation between Special Counsel and the Defendant's fine attorneys here. And they're really very good and have done some impressive work.

But it's different, and I -- I do want to suggest it's not clear to me that the argument is necessarily that the Court made an error. It -- it may -- and that the -- the issue will turn necessarily on what the statute says

regarding the crediting of time.

I think that issue will have to be evaluated in this case on the facts of this case in light of the language of this paragraph 19 of the plea agreement. And this language, like I said, I don't know if the argument has been made that it's vague. I don't think they need to say that actually, but the -- the argument is that -- the -- the sentence provides that the credits that the Bureau of Prisons may allow under Section 3585 "may be credited against this stipulated sentence, including credit under Sentencing Guidelines Section 5(g)1.3."

Now, when I looked at 5(g)1.3 in preparation for this hearing, I'm not sure, frankly, what the Special Counsel who drafted this agreement and who -- the -- the Government is -- is -- as the draftsman of plea agreements, any ambiguity in the language is going to fall on us, not on the Defense, and that's the way it should be.

It says including credit under the Sentencing guidelines, under 5(g)1.3. The only provision of that guideline that I see potentially applicable and which I, therefore, assume the Special Counsel must have been -- must have had in mind is a provision which it's subsection (b) I believe, (b)(1) maybe, where they talk about how the Court can -- let me get the language actually, rather than rely on my failing memory.

It says the Court -- as part of Subsection (b), and, again, one questions whether the -- what relevance the guideline has at all, but it's cited by the Special Counsel's Office as part of the agreement that it -- that it is a key part. It's the paragraph that defines what the parties are agreeing to regarding a potential sentence. And in Subsection (b)(1), it talks about how the Court under certain circumstances shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment.

I think that what they're talking about is that we had -- as the Court knows, there were two cases resolved as part of the -- the plea -- this plea agreement, and I think it was largely a duplicate, if memory serves, that was filed in the other case. And they were both -- the Defendant was sentenced at the same time relating to both cases. So, I think they have that in mind. And, as a result, I think that Defense raises a substantial question in my mind not about what the statute provides and, you know, whether the Court has jurisdiction to credit stuff under the guidelines. It suggests that the Court does have the ability at least under Booker these days to give credit for time served on the stipulated sentence, which may arguably -- and that's -- any ambiguity, again, goes for the Defense -- that it may proper -- that the Defendant may have understood that the

credit for time served would be taken away against the stipulated sentence, whatever the court had agreed upon.

So, that's my concern, and I think that when we entered the stipulation, we had -- it wasn't -- I don't want to say we because I was asked to be on the case I think Wednesday of last week. So, it was after the stipulation was filed. But when I started looking at it, that -- that was the question that immediately came to my mind as -- as an ambiguity that raised the issue about whether the credit for time served should have been decided by the Court and whether it could have been, under the Sentencing Guidelines and should have been credited at that time against the 72 months which would have substantially reduced the sentence by about 11 months.

THE COURT: That is -- that is done --

MR. KEENAN: That's -- that's my view.

THE COURT: That is done by the Court under certain circumstances.

MR. KEENAN: Yes.

THE COURT: One of those circumstances -- well, the only circumstance I can find is that when the Court determines that the Bureau of Prisons will not make the adjustment.

MR. KEENAN: That's one circumstance.

THE COURT: I don't see any others.

MR. KEENAN: Under the -- under the Sentencing Guideline 5(g)1.3, it appears to be within the Court's discretion to do that, and it appears on the language of paragraph 19 that that's exactly what the Defendant expected as part of the -- the plea bargain that he struck with the Special Counsel's Office. It's a hard-fought negotiation, and that's what the product of it was, and I -- I do think at -- I'm making no final representation about how the -- the appeal may result. The Ninth Circuit would decide that. But is it a substantial question? Well, as to that, there was a -- I want to -- you know, the -- the Ninth Circuit has made clear as far back as United States v. Handy -- that's a case often cited in connection with these motions -- it says:

> "We conclude that a substantial question is one that is fairly debatable or fairly doubtful. In short, a substantial question is one of more substance than would be necessary to a finding that it is not frivolous," which

is a remarkably low standard. And they could have put that more blunt -- more simply I think we can all agree -- a nonfrivolous argument.

And in light of my view and, frankly, concerns about the -- the nature of the language and how it meshes

with the statutory provision that the Court was making reference to in the Ninth Circuit case law relating to that and 5(g)1.3 and the guidelines, I think there's a substantial question that is likely to result in reversal of the sentence, not due to any error on your part. I want to make that clear.

THE COURT: Then what happens? Then what happens?

MR. KEENAN: It's --

THE COURT: So -- so, the -- the -- the -- there's a -- well, what -- what you believe Mr. Smirnov is looking for is for the Ninth Circuit to set aside his entire sentence?

MR. KEENAN: To vacate the sentence and send it back for resentencing.

MR. CHESNOFF: No. To withdraw the plea.

MR. SCHONFELD: To withdraw the plea.

THE COURT: Oh, you're going back --

MR. KEENAN: I'm sorry. At -- at which point -- at which point it would be an option for them to withdraw the plea.

THE COURT: Okay. "And go to trial?

MR. SCHONFELD: Correct.

THE COURT: Okay.

MR. KEENAN: So, now, on that subject, you know, it's a question of how much -- you know, in base -- I'm not

a baseball fan, but I'll fake it for a minute. My recollection is that, you know, the pitch zone or whatever, right, you know, zone umpires have it a little wider than others, a little taller than others.

So, like I said, I'm -- I'm really not a fan. I'm faking it. But I watch the news -- nightly news, and the sports guys talk about that sort of stuff.

So, anyway, when you're -- when you're evaluating -- when you're evaluating the substantiality of the claim and the -- the parties' stipulation and the arguments which I've just gone through and the defense counsel have gone through, I think it's important to consider on -- on -- you know, how much leeway you give those arguments, how much weight you give them, in other words, as well as to the issue of flight, an important issue, and it's an equitable one, a really important one in my view, and that is that his -- he has a serious medical problem which is causing deterioration of his eyesight while he's been in custody.

The first time I heard that, because I'm a skeptical guy, you know -- after 24 years as a prosecutor, you -- you get that way, but so I -- I started to ask. The first question I had is, Where is the proof of that? Well, the -- the proof is that he's had seven prior surgeries. It's referenced in the Pretrial Services Report, I think the first one and the second, if memory serves.

He has -- he's had seven prior surgeries during the preceding year before he was detained in connection with this case, surgeries -- or surgical procedures designed to reduce the intraocular pressure, which is essential for glaucoma, to ensure that it doesn't deteriorate the -- the ocular nerve and ultimately lead to blindness. And it is an unfortunate fact -- I wish it weren't true, but it is an unfortunate fact that the BOP and the U.S. Marshals Service has not -- have not been able over the time that he's been in custody to ensure that he gets those surgical procedures, and they need to happen on a regular basis, which is why he's had seven of them already.

And, as a result, it is my understanding that -- and as defense counsel have represented, that when the -- I think it was the Marshals Service in or around November of last year took him out of custody and brought him to some sort of a medical consultant doctor, aka, a doctor, that -- that they determined that he had suffered a degradation to his eyesight and is now legally blind, which is awful.

There's a -- there's a -- a phrase I've heard or a sentence that I've heard recently, well, last few years, talking about how -- and it's usually a -- it's usually in a sarcastic and derisive criticism of the criminal justice system, and it is that the process sometimes is the punishment. And, so, we want to make sure because the

Department of Justice is willing to take a look, just as Martin Estrada would, is willing to take a look anew at this case and how -- its provenance and how it came about and the other particulars, to evaluate the fairness of the prosecution. The question is, while that deliberative process is underway, should Mr. Smirnov be detained pending his appeal and pending that deliberative process. And I think in light of, in my view, the decision maker, I submit to you, ought to be the Court's ultimate decision maker as to how its -- how it evaluates the -- the question under whatever statute, 3413 I think it is, that the Court ought to give significant weight to the medical issue that is over time blinding Mr. Smirnov. I think he's in his early 40s. That's intolerable to me. It's intolerable to my office, and we think it should be given great weight by the Court in ruling on this stipulation.

If I might just finally address some issues just about flight, it is accurate that the Pretrial Services Office first out in Nevada and then out here, just in their Pretrial Services Report issued on Friday I think it was, concluded that he's not a flight risk and that -- that bail pending appeal would be appropriate.

I think, as the -- as the stipulations and some of the arguments you've heard today make clear, this is a Defendant who has continued to engage with the Government.

He -- as you know, as the record makes clear, he previously served approximately 12 years as an informant for the FBI and before that, HHS, Health and Human Services. And he's continued to engage the Government in discussions about his case through his counsel, and the -- the Department is -- I don't want to speak on behalf of the Department. My understanding is that the -- the Government generally is receptive at least to the -- the presentations that have been made thus far and willing to listen and willing to take a second look and to, as I said earlier, think a second time.

And, so, in light of that, we are at -- when it gets to -- I'm still talking about flight. When we get to the subject of flight risk, the -- whatever impulse he might have had in February -- I don't think he had any impulse at the time, for reasons I'll mention in a moment -- but it's the -- the lowest incentive that he would ever have to flee the country is right now, when he has a receptive ear to people who are willing to look at it anew, at his case anew, and see whether or not a different result might be the appropriate disposition of this case.

So, I don't think he has an incentive to flee. And, again, if he ever did, it's the lowest incentive at this point. It would be foolish and absurd for him to flee to the garden spot of Russia, maybe a nice -- you know, nice

spot on the coast of Siberia perhaps. He's been a life -- not a lifelong but a longtime resident of this country. He's a naturalized citizen, a longtime resident of the southwest of the United States, living either in California or Nevada for approximately 20 years. He has a longtime relationship with a -- variously described in the papers, as a common law spouse or a girlfriend. He has a stepson who he loves and who, as the Court mentioned, that was the servicemember who I think submitted some sentencing letter on his behalf.

And, so, he has significant ties to this country is my point, and it's -- it's consistent with his work as an informant as well, which, you know, I always take the view that when we're talking about cooperators who do work on behalf of the Government and then occasionally they -- they run afoul of a particular statute, I think it's really important to consider both the -- the good and the bad, right. We always look at criminal history. What's his criminal history? You know, it can go back 10 years, but we still take account of it, and -- and I think the good conduct ought to be considered as well and in evaluating flight risk and the general issue that the Defense intends to pursue on appeal.

Is there anything else I wanted to say? I think -- I think that's it. Thank you very much for your

attention. I much appreciate it. Thank you.

THE COURT: Thank you, sir, for clarifying -- clarifying some things. Of course, you have -- since you aren't participating in this -- this reexamination of the Government's charging decision in this -- this case, you probably can't even make an educated guess as to how long this process is going to continue.

MR. KEENAN: I wish I could, but I can't.

THE COURT: Okay. That's fair.

MR. KEENAN: But I think there's an -- an interest in resolving it quickly, and what quickly means is, unfortunately, where I get hazy. I don't know really what that means, but I -- I know that it has the attention of people above me in the decision making chain, and that I -- I don't think they want it to sit around endlessly and percolate. They want to look at it and make a decision.

THE COURT: I've seen evidence of U.S. Attorneys Office being presented with really a massive amount of work and not much time to do it actually get it done, much to my amazement. So, if they are suitably motivated --

(Pause.)

THE COURT: Anyway, I think when suitably motivated, they can do vast amounts of work in a short period of time. So, I'm going to hold out hope that -- pardon?

(Pause to confer with clerk.)

THE COURT: Back to what I was going to say, I'm fairly -- I'm fairly confident that when properly motivated, the Government is going to -- to move expeditiously in terms of their review and making a decision one way or another what they plan on doing with this case.

Right now, I've done all I'm going to do with this case, and Mr. Smirnov doesn't agree with that. So, the fortunate thing is it is now before the Ninth Circuit, and I'm satisfied to let them do their work.

So, everyone has had a chance to speak, the matter stands submitted.

MR. KEENAN: Yes, your Honor. Thank you.

THE COURT: I haven't heard anything that's going to change my mind. So, with that, we're done.

MR. KEENAN: Very well. Thank you very much, your Honor.

THE CLERK: The court is in recess.

(Proceedings concluded.)

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Jordan Keilty 4/29/2025
Transcriber Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.